## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## BUTTE DIVISION

ROBIN POTERA-HASKINS,                )
                                     )          No. CV-05-22-BU-SEH
         Plaintiff,                 )
                                     )
  -vs-                               )          **MEMORANDUM**
                                     )          **AND**
MONTANA STATE UNIVERSITY-            )          **ORDER**
BOZEMAN,                             )
                                     )
         Defendant.                 )
                                     )

## INTRODUCTION

Plaintiff, Robin Potera-Haskins (Potera-Haskins), former women's

basketball coach at Montana State University (MSU), brought this action against

MSU claiming Defendant had retaliated against her, in violation of Title IX of the

Education Amendments of 1972[1], for reporting concerns Plaintiff believed

---

[1] 20 U.S.C. § 1681, *et seq.*

violated Title IX.[2]  A four-day trial to the Court on liability issues was conducted.[3]

Oral testimony[4] and documentary evidence was received.  Proposed findings and

conclusions and briefs were filed.  The matter is ripe for decision.

## ELEMENTS OF LIABILITY - TITLE IX

20 U.S.C. § 1681(a) (2006) provides "[n]o person in the United States shall,

on the basis of sex, be excluded from participation in, be denied the benefits of, or

be subjected to discrimination under any education program or activity receiving

Federal financial assistance . . . ."  In Texas Dept. of Cmty. Affairs v. Burdine, 450

U.S. 248, 252-53 (1981), the Supreme Court outlined the elements of proof for a

Title IX claim:

- Plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination;

- If a prima facie case is established, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection," Burdine, 450 U.S. at 253 (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973));

- If the defendant carries its burden as outlined above, plaintiff may

---

[2] Additional claims asserted in the Complaint were dismissed by stipulation (Counts I, III, and IV) (Docket No. 33), or resolved in favor of Defendants on summary judgment (Counts I and II).  Docket No. 87.

[3] Liability and damage issues were bifurcated for trial by Order of November 2, 2009. Docket No. 177.

[4] Sixteen witnesses testified live and five witnesses were presented by deposition.

prove by a preponderance of the evidence that the reasons offered by defendant were not true reasons for its actions, but were a pretext for discrimination; and

- The ultimate burden of proving intentional discrimination is always upon the plaintiff.

Proof of a prima facie case itself requires several criteria be met:

- Plaintiff must show engagement in activities or rights protected under Title IX;

- Plaintiff must show defendant knew of the protected activity or assertion;

- Plaintiff must show defendant thereafter subjected plaintiff to adverse action, treatment, or retaliation;

- Plaintiff must prove a causal connection between the protected activity and the adverse action.

A defendant's legitimate-reason defense requires the defendant present evidence it took action for "a legitimate, nondiscriminatory reason." Burdine, 450 U.S. 253 (quoting McDonnell Douglas, 411 U.S. at 802). Such reason or reasons must be shown by introduction of admissible evidence.[5] Pretext rebuttal recognizes plaintiff retains the burden of persuasion and requires plaintiff demonstrate the proffered reason for action was not the true reason. This may be

---

[5] The Supreme Court noted in Burdine, 450 U.S. at 255-56 "[p]lacing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions."

accomplished by "persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Burdine</u>, 450 U.S. at 256.

The trier of fact makes the ultimate determination of liability from all of the evidence evaluated in light of the steps outlined.  This determination of necessity requires the Court to weigh the evidence, particularly the witnesses' testimony, taking into account all factors which may bear on credibility.[6]

## FACTS[7]

In April of 2001, Plaintiff was hired as the head coach of the women's basketball program at MSU-Bozeman.  She occupied that position until April of 2004.  Before she was hired, she was interviewed by Geoffrey Gamble, President of the University.  At that time, she was apprised that the University's priorities for the women's basketball program, in descending order of importance, were: (1) student success and welfare; (2) adherence to rules; (3) fiscal responsibility;

---

[6] Long-recognized and established credibility factors include: the opportunity and ability of the witness to see or hear or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interest in the outcome of the case and any bias or prejudice; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence; and any other factors that bear on believability.

[7] The narrative statement recited in this section reflects and incorporates the Court's findings of fact under Fed. R. Civ. P. 52.  Facts stated also reflect, in instances where evidence of record is conflicting, the Court's determination of issues of credibility of witnesses and weight of the evidence.

and (4) a competitive program.  Her employment contract included the specific agreement "that student athletes should be integrated into the academic environment, that academic success is paramount and that graduation is the primary goal for student athletes." (Exhibit 525 at ¶ 3(b).)

Win-loss performance of the women's program initially improved with Plaintiff as head coach.  The team was co-champion of the Big Sky Conference for the 2001-2002 season.  Plaintiff was accorded an above-average formal job appraisal for the 2001-2002 season.  The team was again co-champion of the Big Sky Conference for the 2002-2003 season.

By the spring of 2003, the University had begun to receive complaints and adverse comments concerning Plaintiff's conduct as coach from players, parents and fans.  Six players quit the team or left the University in the spring of 2003 because of conflicts with Plaintiff and unhappiness with how they were treated on the team.

A select committee comprised of five university officials[8] was formed to

---

[8] Committee members were Marjorie Brown, Human Resources/Affirmative Action Department, Susan Capalbo, Faculty Member in Economics Department and Agricultural Economics Department, Vice President for Research Office and Member of University Athletics Committee, Robert Glen Oakberg, Associate Professor of Civil Engineering and Faculty Athletics Representative, Linda Simonsen, Math Faculty and Member of Athletics Committee, and Vickie Tischendorf, Department of Athletics Compliance Officer and Senior Woman Administrator.

investigate the developing concerns. The committee met with the departing

players, all of whom had been recruited to MSU by Plaintiff, and others and issued

a report in April 2003.[9]  Findings included that players had been subjected to

humiliation and distress by Plaintiff's behavior, that players believed she had lied

to them, that she blamed players for her mistakes, that she could not control her

behavior, and that she acted in disregard of other responsibilities of staff and

players.  Plaintiff was found to lack credibility with the players and to have a lack

of respect for them as players and as individuals.  Her coaching style was

characterized, *inter alia*, as out of control, rude, degrading, hysterical, and

unstable.  Inappropriate comments made to players included: (1) "'You're a piece

of shit'"; (2) "'I can't stand you'"; (3) "'You'll never amount to anything;'"

(4) "'I Don't care who fuckin' plays' (threw chalk, N AZ locker room)." (Exhibit

510 at 4). At least one player sought counseling and suffered a drop in academic

performance as a result of Plaintiff's treatment of her.

After the report was rendered, University officials met to address the

then-disclosed concerns with Plaintiff's conduct as coach. Some sentiment to

dismiss Plaintiff at that time was expressed.  Instead, at the request of the Athletic

Director, a program was developed to attempt to work with Plaintiff to address the

---

[9] Plaintiff did not accept an invitation to meet with the committee.

numerous problem areas. Several meetings were held with her. Specific problem areas requiring adjustment or correction were discussed. An experienced sports psychologist was made available to meet with plaintiff and team staff.

Additional problems with Plaintiff's treatment of players came to the attention of the University near the beginning of the 2003-2004 basketball season. On October 22, 2003, University officials learned that a violation of the NCAA 20-hours-per-week-practice-time limitation rules had occurred,[10]obliging the Athletic Director to step in and order a reduction of practice time to a time limit within NCAA rules.

By the end of October 2003, the University had been informed that players had been instructed by Plaintiff not to talk to assistant coaches or to the team trainer, and that an assistant coach was placed by Plaintiff in the team training room to ensure players were not "gossiping." Team trainers and other athletic staff members expressed concerns over player fatigue and team medical condition issues.

An investigation into the NCAA practice time issue was immediately undertaken, and on November 4, 2003, a meeting was held with Plaintiff. Excessive practice times and other issues were addressed. Specific directions,

---

[10] Plaintiff had told players not to worry about the 20 hour practice time limit.

-7-

grounded in the University's clearly-justified concerns for student-athlete welfare, were issued to Plaintiff, including: (1) practices limited to 15 hours per week for 2 weeks; (2) no practice in excess of 18 hours per week for balance of season; (3) no coach to be stationed with players to monitor or prevent "gossip"; (4) student athletes to be free to talk to assistant coaches; and (5) no retaliation to be undertaken by Plaintiff against her players, the student athletes.[11]

Plaintiff's significant deficiencies, shortcomings and lack of qualifications to serve as head women's basketball coach at MSU were clearly articulated by substantial credible evidence grounded in personal experience by former players. The basketball season was "six months of hell" for one graduating senior. Another described it as emotionally and physically exhausting. Plaintiff was seen

---

[11]The November 4, 2003, meeting was followed by a November 6, 2003, letter to Plaintiff which included the following:

> At this point my re-evaluation of the program is not good. The disregard for the S/A's [student athletes] welfare is at the heart of my concern. To this point Montana State University will not tolerate ANY retaliation perceived or real towards the Student-Athletes or staff. You must re-evaluate what you are doing and change your time constraints on these S/A's. At no time through this process have I talked to you about winning. Winning is not what I am evaluating you on.
>
> The above concerns must be answered and corrected immediately for the welfare of our student-athletes.

(Exhibit No. 535).

as self- centered, and demonstrated no interest in players as individuals or their academic careers, personal lives or families.  Players were pitted against each other. Practices and coaching were inconsistent and unpredictable.  Her communication and personal skills were characterized as very poor.  Player-requested meetings with Plaintiff were denied.

The experience of one former player with Plaintiff is particularly revealing.[12]  Plaintiff promised student Jinnifer Jeresek that she, Plaintiff, would assist the student, who had committed to an internship in the office of one of Montana's United States Senators, in obtaining a "full-ride" scholarship worth $25,000 per year, including room and board, at a law school of the student's choice if the student would agree to return to MSU and play basketball during her final season of eligibility.  In reliance upon Plaintiff's representations, the student agreed to remain at MSU and play basketball, did so and graduated in 2003.  She later learned through her own efforts and inquiries that the promised scholarship program did not even exist.

Plaintiff denied as "absolutely absurd and impossible"[13] any suggestion of having committed to assist Ms. Jeresek with a law school scholarship.  I

---

[12]This former player, Jinnifer Jeresek, has since completed law school and is now a member of the Bar and a practicing lawyer.

[13]  (Tr. of Bench Trial Proceedings, Volume 4, 986:11.)

categorically reject this denial as having any credibility whatsoever.

Many of the team members approached Senior Woman Administrator for Athletics, Vickie Tischendorf, to complain of Plaintiff's lack of respect for the student athletes, her pitting of one player against another, her not respecting their class schedules, and her interference with the student athletes' communications with other athletic staff. She learned five of the players intended to leave if Plaintiff remained. She determined, on her own, to bring her concerns to the Vice President of Student Affairs. She did so.

The select committee was reconvened to address the recurring and ongoing problems arising from Plaintiff's conduct as coach and the University's growing concerns over student-athlete welfare. Players were interviewed by members of the committee. The conclusion was quickly drawn by at least one member that the students were suffering at the hands of Plaintiff. All members of the committee concurred that Plaintiff should be terminated as head coach.

The committee, in turn, met with the University President, Geoffrey Gamble, and recommended termination. Each member expressed his or her decision was based solely on concerns for student welfare, that Plaintiff's conduct as coach was harmful to that welfare, and for no other reason.

President Gamble took the committee's recommendation under consideration. He then met with Plaintiff and again explained to her the University's priorities for its student athletes first stated to her before she was hired.

The University Athletic Committee[14] conducted spring 2004 exit interviews with departing members of the women's basketball team and reported to President Gamble on March 25, 2004. The report concluded with the following statement:

> Finally, it should be noted that this is now the third season in succession in which, in exit interviews, student athletes have expressed similar substantial reservations about the women's basketball head coach and the quality of their experiences at MSU as student athletes in the women's basketball program. In fact, the University Athletic Committee cannot recall a single exit interview in which any student provided a positive review of the head coach since she was appointed to that position.

(Exhibit 542 at 4).

After receiving the March 25, 2004, report, President Gamble determined to request that Plaintiff either resign or be terminated without cause. The decision was his alone and he was the sole and ultimate decision-maker on terminations. His reasons were that the team was in turmoil, the players felt demeaned and dehumanized, the program was not meeting the stated goals of the University or

---

[14] Members of the committee were Susan Capalbo, Robert Oakberg, Linda Simonsen, Vincent Smith, and J.R. Woodward.

the University's vision of high premium on student success and student welfare,

and the number of students leaving the program and their reasons for doing so,

including their tremendous unhappiness, stress and negative feelings accrued from

being part of MSU women's basketball.

Plaintiff declined to resign. She was terminated without cause consistent

with the terms of her employment contract on April 7, 2004.

On November 10, 2003, Plaintiff raised, for the first time, the matters that

form the basis for the Title IX claim, namely, that she was forced by Peter Fields,

the Athletic Director, "to place his daughter [Briana Fields], who was not qualified

to play at the NCAA Division I level, on the MSU women's team and give her a

full scholarship, thus undermining the women's basketball program in violation of

Title IX. (Final Pretrial Order at p. 2 (Aug. 4, 2010).)

In the academic year 2001-2002, Briana Fields had been a student and

member of the women's basketball team at Drury University in Missouri. In the

summer of 2002, she visited her family in Bozeman. While there, she met with

Plaintiff who had seen Ms. Fields play earlier in two games between Drury and the

team coached by Plaintiff before coming to MSU. Plaintiff took Ms. Fields to

lunch. During the lunch conversation, Plaintiff informed Ms. Fields that she

would be welcome to play at Montana State if she elected to transfer. Plaintiff

-12-

later called Ms. Fields and sent her a "good-luck-on-your-season" shirt. Plaintiff also informed Peter Fields "that Briana could play for her [Plaintiff] any time."[15]

Ms. Fields transferred to MSU at the start of the 2002 fall semester. She was allowed to join the women's basketball team as a non-scholarship walk-on. Under NCAA rules, she was not eligible to compete for MSU from January 2003 until the end of December 2003. She was described by teammates as neither resented nor disruptive, that she did not complain, and that she sought to prove she deserved to be on the team.

After Ms. Fields' summer visit, Plaintiff informed other players that she was thinking of giving Ms. Fields a scholarship. She informed at least two players that awarding Ms. Fields a scholarship would assist in manipulating Peter Fields to provide special favorable treatment to the women's basketball team. She did later say to Peter Fields that she thought Ms. Fields should remain at Drury University.

Plaintiff, as head coach, had sole authority to award women's basketball scholarships. In the spring of 2003, she awarded such a scholarship to Briana Fields. Peter Fields did not ask her to award the scholarship. He learned it had been awarded from Plaintiff who called Fields and informed him of the award and that she was happy to have Briana.

---

[15] (Tr. of Bench Trial Proceedings, Volume 3, 585:18.)

Immediately after Plaintiff's November 10 allegations were made, Peter Fields removed himself from any supervision of Plaintiff. Plaintiff's authority to make decisions related to the women's basketball team was confirmed to her in writing by the University.

The creditable evidence of record supports neither a finding nor an inference that Plaintiff was forced or otherwise improperly influenced to award Briana Fields, who was already on the team in a non-scholarship capacity, a scholarship. The choice was Plaintiff's to make and she made it for reasons expressed to other players long before the award was made. Creditable evidence likewise fails to support Plaintiff's contention that Peter Fields "had placed Briana on the women's basketball program,"[16] or as claimed by Plaintiff, that Peter Fields at any time "had totally taken the basketball program"[17] from Plaintiff or that Briana Fields "wanted to run the program."[18]

## DISCUSSION

The legal principles for establishing a *prima facie* Title IX violation, proof of a legitimate non-discriminatory-reason defense, and proof of pretext rebuttal

---

[16] (Tr. of Bench Trial Proceedings, Volume 1, 76:6-7.)

[17] (Tr. of Bench Trial Proceedings, Volume 1, 77:12-13.)

[18] (Tr. of Bench Trial Proceedings, Volume 1, 73:15.)

outlined above are well-settled.  The task at hand is application of those principles to the facts of the case tried.

As noted at the outset, central to the analysis process is determination of witness credibility.  When those assessments and determinations are made, facts essential to resolution of the claim are clear.  No legitimate claim of disparate treatment of women's basketball or of Plaintiff on Title IX grounds was proven.  The University did not retaliate against Plaintiff for asserting Title IX issues.  The University's decision and action to terminate the Plaintiff's contract were clearly demonstrated to have been made and carried out for legitimate reasons.

Regrettably, but unequivocally, the Court has found Plaintiff not to be a creditable witness on the significant issues of the case.  I have concluded, as I must from the record, that the entirety of Plaintiff's Title IX complaints were undertaken to draw attention from or to blunt the impact of the extremely serious and harmful consequences of her conduct as head women's basketball coach.

On the other hand, the University's course of action in terminating Plaintiff was entirely justified and appropriate for a myriad of reasons in no way related to retaliation.  I am satisfied that the former players who testified to their experiences and abuse at the hands of Plaintiff did so honestly.  None of the several University personnel who had a part in the process and who testified can be said to have been

-15-

other than forthright and honest in their statements to the Court.

The facts of this case underscore the obligation and the responsibility a university assumes, as MSU did in this case, to protect the well-being of its students. Not only was the University justified in terminating Plaintiff, it may have been derelict in meeting its responsibilities if it had not done so. If any criticism of what it did could be said to be justified it would be that action should have been taken sooner than it was.

## CONCLUSION

The Plaintiff failed to establish a *prima facie* case of retaliation or other violation of Title IX. Even if such a *prima facie* case were assumed to have been proven, the record is overwhelming that the action of terminating Plaintiff was in no way a pretext but was fully justified and necessary.

## ORDER

The Clerk is directed to enter judgment dismissing the claim tried (Count II) and the claims previously dismissed by summary judgment (Counts I and V).

DATED this _10th_ day of August, 2010.

SAM E. HADDON
United States District Court

-16-